JORDÁN, DEMANDANTE Y APELADO, *v.* RODRÍGUEZ, DEMANDADO Y APELANTE.

APELACIÓN procedente de la Corte de Distrito de Arecibo en procedimiento de *injunction.*

No. 2346.—Resuelto en diciembre 18, 1923.

DEDICACIÓN DE PROPIEDAD AL USO PÚBLICO.—El dueño de una casa situada en terrenos de otro puede, si el dueño del terreno no se opone, construir allí una acera o cualquiera otra edificación que sirva para el mismo fin y si así lo desea, dedicarla al uso público. Pero el uso poco frecuente o más o menos intermitente por parte del público, durante un período de 16 ó 18 años, de una pared maestra u otra construcción levantada con algún fin que el dueño conoce mejor que nadie, no puede sin más producir el efecto de una dedicación al público.

*Injunction*—DAÑO IRREPARABLE.—La cuantía del daño no influye en el derecho a solicitar y obtener el *injunction,* pero el daño debe existir y ser irreparable y debe existir alguna relación de causa entre el daño y el demandado o alguien bajo su autoridad.

Los hechos están expresados en la opinión.

Abogados del apelante: Sres. *L. Feliú* e *I. Carballeira.*

Abogados del apelado: Sres. *Lastra Charriez & Jiménez Sicardó.*

EL JUEZ ASOCIADO SR. HUTCHISON, emitió la opinión del tribunal.

La corte de distrito expidió un auto de *injunction* para impedir la construcción de un edificio de concreto ya en un estado bastante adelantado, dentro de los límites prescritos por una autorización dada por el municipio y de conformidad con planos previamente sometidos y aprobados

tanto por el municipio como por el Departamento de Sanidad Insular.

Los señalamientos 11 y 12 son que la corte inferior cometió error al denegar una moción de *nonsuit* y al dictar sentencia a favor del peticionario. Las conclusiones de hecho y de derecho que sirvieron de fundamento a esa sentencia después de resolver un sin número de cuestiones más o menos dudosas y que no es necesario discutir, son las siguientes:

"Que la Asamblea Municipal de Manatí concedió al demandado, Emilio Rodríguez, el uso, sin propiedad, de un solar sito en la calle McKinley, esquina Avenida Colón, de Manatí, en una extensión de 33 pies de frente por 92 de fondo; que el Concejo de Administración de dicho pueblo le dió autorización para edificar en dicho solar, en el que tenía el demandado una casa de madera; que Octavio Jordán Miranda, el demandante, es dueño de una finca urbana, en la que reside con su familia, sita en la calle Avenida de Colón, y situada casi al frente del solar concedido al demandado; que el demandante era miembro de la Asamblea Municipal de Manatí en la fecha en que se hizo la concesión y votó en contra a que ésta se hiciera al demandado; que la Avenida Colón es una calle antigua abierta al público desde el año 1890, y que frente a la antigua casa de madera del demandado existía una acera y cuneta que eran también de uso público, construída la primera desde hace más de 20 años; que el departamento de sanidad aprobó un plano presentado por el demandado para la edificación en el referido solar; que dicho demandado comenzó a edificar una casa de concreto fuera de la alineación constituída por su antigua casa de madera, utilizando dicha acera y cuneta y a una distancia de tres metros noventa y dos centímetros del eje de la Avenida Colón, comprobando este hecho por medidas tomadas de sardinel a sardinel por ingenieros del Departamento de Sanidad Insular, al tener conocimiento dicho Departamento que la construcción se hacía a menos de cinco metros del eje de la calle; que cuando el demandado empezó la construcción la Avenida Colón tenía una anchura de 7 metros 84 centímetros de sardinel a sardinel, según las medidas tomadas por dichos ingenieros; que con posterioridad a la demanda de *injunction,* sin conocimiento del Departamento de Sanidad Insular, y frente al solar concedido al demandado, se le ha dado a la Avenida Colón

una anchura mayor, habiéndose construído aceras en ambos lados, yendo la del lado Este a encontrarse precisamente con la propiedad del demandante, en donde la Avenida no ha sido ensanchada. La ordenanza municipal de Manatí, adoptada el 19 de abril de 1915, a que se refiere el demandante en su demanda sobre construcciones dentro de la ciudad, no fué presentada como prueba y por tanto la corte no puede tomar conocimiento judicial de su existencia; El Pueblo v. Suárez, 23 D. P. R. 243, y El Pueblo v. Nochera, 23 D. P. R. 605. Pero la corte si puede tomar conocimiento judicial de los reglamentos de Sanidad adoptados de acuerdo con la Ley para reorganizar el servicio de Sanidad, aprobada el 14 de marzo de 1912, que dispone en su sección 15 que todas las cortes tomarán conocimiento judicial de la promulgación de tales reglamentos y de la publicación de los mismos. Al usar dicha sección las palabras "tales reglamentos," se refiere no solo a los reglamentos promulgados por la Junta Insular de Sanidad de acuerdo con la sección 13 sino a los que promulgue el Consejo Ejecutivo de acuerdo con la sección 14 cuando dicha Junta los dejare de adoptar. La Sección 14 de dicha ley faculta la adopción de reglamentos para la construcción de edificios en los pueblos.

"El Reglamento de Sanidad No. 6, estableciendo las condiciones sanitarias que deben observarse en la urbanización de terrenos en la Isla de Puerto Rico, contenido en la Proclama del Gobernador de Puerto Rico de 18 de Septiembre de 1912, y que está aún vigente, dice en su artículo 4: 'En las calles existentes cuya anchura sea inferior a diez metros, no se podrá construir a una distancia menor de cinco metros del eje de dicha calle'. Se probó por medidas tomadas por Ingenieros del Departamento de Sanidad con anterioridad a la demanda de *injunction* que la construcción se hacía a una distancia menor de cinco metros del eje de la Avenida Colón, esto es, a tres metros 92 centímetros del eje de dicha calle, la que sólo tenía una anchura de sardinel a sardinel de siete metros 84 centímetros. También declararon los ingenieros que el eje de la calle había sido variado con posterioridad a la demanda sin que el Departamento de Sanidad tuviera conocimiento oficial de ese hecho.

"Dice el artículo 7 del citado reglamento de sanidad, No. 6: 'Cada Municipio deberá preparar dentro de un plazo de seis meses un plano de los terrenos ya urbanizados comprendidos en su término municipal y que no reúna las condiciones sanitarias fijadas en este Reglamento; en dicho plano se harán constar las espe-

cificaciones necesarias para ajustar tales terrenos urbanizados a lo dispuesto en los artículos 3 y 4. Y una vez que haya sido aprobado dicho plano por el Director de Sanidad, el municipio sólo podrá autorizar en adelante las construcciones que se hagan en dichos predios urbanos de acuerdo con las condiciones especificadas en los expresados planos. . . . . Es cierto que el plano de los terrenos urbanizados a que se refiere este artículo, ya que la calle de que se trata data desde el año 1890, no fué presentada como prueba, pero las declaraciones de los ingenieros en cuanto se refiere a la anchura de la calle no fueron contradichas ni se objetaron en ese extremo, y por tanto la corte debe tenerlas como ciertas y declarar como hecho probado que la construcción se hacía a menos de cinco metros del eje de la calle.

"La Ley Municipal vigente no ha derogado los Reglamentos de Sanidad. Sólo ha derogado expresamente, por su sección 75, las secciones 26 y 36 de la Ley para Reorganizar el Servicio de Sanidad; y entiende la corte que por el hecho de que dicha Ley Municipal autorice a los municipios para dictar ordenanzas y resoluciones en materia de ornato, alineación de calles, apertura de parques, reglamentación de construcciones, vías públicas, alcantarillados y la concesión de solares, no por eso está en conflicto con el Reglamento de Sanidad No. 6 citado, que establece como condición sanitaria que cuando la anchura de una calle sea inferior a diez metros no se podrá construir a una distancia menor de cinco metros del eje de dicha calle. El sitio en que está la casa del demandante, contruída con anterioridad a la modificación que se hizo de la alineación de la calle por la nueva construcción del demandado, es un sitio público y de mayor tránsito en la municipalidad de Manatí y que conduce a la estación del ferrocarril. El cambio que en la dirección de la línea de la acera derecha de la Avenida Colón se hizo por el Municipio sin el conocimiento del Departamento de Sanidad, establece una anchura en esa parte de la calle distinta a como existía antes de comenzar el demandado la edificación de su casa, y avanzando la calle hacia abajo estrecha la misma frente a la residencia del demandante, de manera que si ahora se tratase de poner esa calle en igual condición de anchura tanto a su comienzo como a su centro necesariamente el jardín y la escalera de la casa del demandante tendrían que ser derruídos y al derruirse la propiedad del demandante adquiriría un valor menor que el que actualmente tiene y el que tenía al momento de

comenzarse la construcción y de cambiarse la alineación de la ca-
lle sin el consentimiento del Departamento de Sanidad.

"Se ha alegado y se ha probado la existencia del daño; su
cuantía no influye para nada en el derecho a solicitar y a obtener
el remedio. Como dice el juez McLeary en el caso de Saldaña et
al. v. El Consejo Municipal de San Juan, et al., antes citado, la
alegación de perjuicios por el valor de un dollar o de un águila es
tan suficiente para fundar en ella una demanda como si se ale-
garan perjuicios por valor de cien dollars o de mil águilas.

En el caso citado se declaró que el Concejo Municipal de la ciu-
dad de San Juan no tenía facultades con arreglo a la ley para au-
torizar a una persona particular a que construya un edificio per-
manentemente sobre una de las calles, aceras,. o plazas de la ciu-
dad. Si eso no puede hacerse en San Juan, tampoco puede ha-
cerse en Manatí y en Manatí se ha autorizado a un ciudadano par-
ticular a construir una casa sobre una acera que era de uso pú-
blico y a menos de cinco metros del eje de la calle, y para permi-
tir este estado anormal de cosas tuvo que hacer una nueva alinea-
ción de la calle con posterioridad a la fecha en que este procedi-
miento de *injunction* fué establecido.

"Hay dos hechos esenciales que no pueden pasar desapercibidos
para la corte: uno que se permitió construir a un ciudadano par-
ticular sobre una de las aceras públicas de las calles de Manatí, es-
trechando una vía pública; y el otro que para sancionar este acto
se fijó, sin autorización del Departamento de Sanidad, una nueva
alineación de la calle y una nueva construcción de la acera, con
perjuicio de los propietarios colindantes en línea recta hacia el
Sud, entre los que se encuentra el demandante. El primer acto
fué realizado por el demandado sabiendo, porque nadie está excu-
sado del conocimiento de las leyes, que ninguna persona puede
construir a una distancia menor de cinco metros del eje de una ca-
lle en Puerto Rico; y el segundo acto fué realizado con perfecto
conocimiento de que las facultades concedidas a los Municipios se
ejercitarán sujetas a las Leyes de Puerto Rico y de los Estados
Unidos que estuvieren en vigor, y que no podrá adoptarse nin-
guna ordenanza, resolución, ni acuerdo que en modo alguno viole
ninguna de dichas leyes; que el Comisionado de Sanidad Insular
tiene a su cargo, de acuerdo con la Ley Orgánica, todos los asun-
tos relacionados con la salud, sanidad y beneficencia públicas; y
que de acuerdo con la ley vigente para reorganizar el servicio de
Sanidad, todos los reglamentos de Sanidad tienen el carácter de

ley y son obligatorios, disponiendo el artículo 7 del reglamento, No. 6, que las ordenanzas municipales que dicten en lo sucesivo los municipios para la urbanización, apertura y alineación de calles, deberán armonizarse de acuerdo con lo dispuesto en el mismo.

No hay duda alguna que el Municipio de Manatí tiene facultades para cambiar la alineación de sus calles mediante ordenanza. al efecto, pero ésta necesita sujetarse a los Reglamentos de Sanidad sobre la materia y llevar la aprobación del Comisionado de Sanidad Insular por lo que se refiere a la salud y sanidad públicas, según claramente se desprende del artículo 7 del Reglamento de Sanidad, No. 6 citado.

Por las razones expuestas la corte es de opinión que la ley y los hechos están a favor del demandante, Octavio Jordán Miranda, y en contra del demandado Emilio Rodríguez, y por tanto declara con lugar la demanda de *injunction* y en su consecuencia haciendo permanente el *injunction* preliminar con fecha 19 de marzo 1920, se ordena al demandado, Emilio Rodríguez, que se abstenga por sí o por cualesquiera otra persona o empleado, de construir, trabajar o edificar la casa que está fabricando en el solar sito en la calle McKinley, esquina Avenida Colón de Manatí, con una medida de 33 pies de frente por 92 de fondo, hasta tanto demuestre a la corte que la casa, por la nueva alineación, se encuentra a una distancia mayor de cinco metros del eje de la Avenida Colón y que el Municipio de Manatí ha acordado dicha nueva alineación y el Departamento de Sanidad Insular aprobado la misma de acuerdo con las Leyes y Reglamentos vigentes sobre la materia, sin especial condenación de costas.''

El Dr. Jordán compró la casa y solar que da frente a la Avenida Colón como dos o tres meses antes de los hechos de que se queja el apelante, y en el juicio declaró que, en su carácter de miembro de la asamblea municipal, se había opuesto a que se hiciera la concesión a Rodríguez porque la casa que iba a edificarse estrecharía la calle y perjudicaría al peticionario; que después de obtener la concesión, Rodríguez empezó a fabricar en el sitio que se le había dado, haciendo uso de la acera y de la cuneta; que el testigo conocía perfectamente la acera pues había vivido en aquel sitio unos tres años; que era de uso público; que

el testigo la había usado; que el ancho de la calle fué re-
ducido porque Rodríguez haciendo uso de la acera y cuneta,
tenía que desviarse el eje de la calle; que el estrechamiento
de la calle era perjudicial al testigo y a su familia por ser
aquel sitio uno de los más concurridos en Manatí; que hay
mucho tráfico allí y el testigo tenía hijos; que la propiedad
del testigo había sufrido una depreciación en su valor de-
bido a la variación en la línea de la calle; que varios indi-
viduos, entre los cuales podía citar él uno que a él se había
dirigido, al tener conocimiento que el testigo iba para los
Estados Unidos y en la creencia de que él vendía la
casa, y al tener conocimiento de ello no hicieron ninguna
oferta por ella; que habían cambiado la calle haciendo una
acera nueva donde había empezado la pared Rodríguez;
que esta acera sobresale dentro de la calle "porque la lí-
nea la han modificado, porque había una línea existente y
han variado esa línea y hecho otra nueva," que a Rodrí-
guez le han dado como dos metros que hay que cogerlos
del otro lado de la calle; que lo que se ha dado a Rodrí-
guez en un lado de la calle fué cogido del otro lado; que
ellos han ensanchado la calle en el lado opuesto hasta la
verja donde está la propiedad del testigo; pero que otra
prolongación por la misma línea haría desaparecer el jar-
dín de la casa del testigo y los escalones de la escalera.

De las declaraciones de otros testigos del peticionario
hacemos las siguientes citas:

### JUAN R. SANTANA

"P.—¿Dijo Ud. que alrededor de una casa vieja se levantaba?
Si, señor; unas paredes de concreto.

"P.—¿En qué forma? Sobre la acera oriental de la calle, es de-
cir la acera que da al poniente, invade la acera la nueva fabrica-
ción, sobre el sardinel de la antigua acera se levanta la pared
oriental de la casa.

"P.—¿Qué llama Ud. acera? La acera antigua, por donde se
transitaba para guarecerse del agua.

"P.—¿Quién transitaba?  El público.

"P.—¿Hace tiempo que transitaba por allí?  Si; señor, mucho tiempo, y apeaban por una escalinata que tenía la acera en la terminación.

"P.—¿Hace tiempo que se venía usando esa acera?  Mucho tiempo; desde que se bautizó la calle esa, hace diez y seis o diez y ocho años.

\*       \*       \*       \*       \*       \*       \*

"P.—¿Al fabricar Emilio Rodríguez esa casa, tal y como la está fabricando, qué sucede en la calle Avenida Colón?  Desde luego que la acera se ha prolongado hacia adelante, y se ha hecho otra acera que sobresale a la que existía.

"P.—¿Ocasionando qué?  Y para que la calle quede del mismo ancho precisa tomar esa cantidad en la acera opuesta de la calle, y eso es lo que se ha hecho.

"P.—¿Qué sucede al tomarse esa parte en la otra acera? · Al seguir esa rasante tendrán que tomar el jardín de la casa de Jordán y tal como está indicado el trabajo, llevárselo por delante.

\*       \*       \*       ·       \*       \*       \*       \*

"P.—¿Esa acera antigua es o no cierto que estaba hecha de piedra?  Pero pavimentada con mezcla, bruñida y enlucida.

"P.—¿Pero de piedra?  Si, señor.

"P.—Esa acera antigua cómo quedaba con relación al nivel de la calle?  Quedaba un poco alta.

"P.—¿Es cierto que en el extremo Norte de la acera había una altura como de un metro?  No tanto, una vara.

"P.  ¿De esas de tres pies?—Si, señor, una vara castellana.

"P.—¿Yendo a la estación del ferrocarril y suponiendo que un individuo anduviera por esta acera antigua y llegara al extremo norte, de ella, de ahí para allá, qué iba a la estación del ferrocarril?  El camino.

"P.—¿Los solares?  Si, señor; se apeaba una escalinata y se seguía por el pavimento natural.

"P.—¿Y diga, pegado a esa acera no iba una zanja de desagüe para las aguas fluviales?  Había un sardinel de tierra que hacía de cuneta.

"P.—¿Qué profundidad tenía esa zanja?  No tenía un pie.

"P.—¿Y corría por todo el largo de la calle?  Si, señor.

"P.—¿La casa antigua que había allí, al rededor de la que se construyó la casa nueva, de quién es?  Dè Emilio Rodríguez.

"P.—¿No fué él que hizo esa acera antigua? No, señor.

"P.—¿Y quién la hizo?. Esa acera antigua la hizo Juan Rivera.

"P.—¿Está seguro? Seguro de que no la hizo Emilio Rodríguez; voy a explicar; porque un primo hermano mío vivía esa casa antes que Emilio Rodríguez, y la frecuentaba a menudo y ya tenía la acera.

"P.—¿Cuándo compró Emilio Rodríguez esa casa? Lo ignoro.

"P.—¿Y cómo sabe que antes que él la tenía un primo que visitaba la casa? Porque no estaba en posesión de ella y no tenía tienda en ella y después despalillado.

"P.—"¿Porque no tenía tienda en ella es que no sabe cuándo la compró? Si, señor.

"P.—¿Y sabe que antes había un primo de Ud. y estaba hecha la acera? Si, señor.

"P.—¿No es cierto que Ud. ayudó a Octavio Jordán a constituir la fianza que ha prestado para el *injunction* preliminar?

"Abogado Sr. Jiménez Sicardó—Me opongo; no veo la pertinencia de la pregunta.

"Hon. Juez.—puede decir.

"Testigo.—El primer día que se vino aquí vine y al llegar aquí creímos que la fianza podía ser firmada y fuimos a la casa de Gandía y a donde el juez Lloreda y dijo éste que prefería metálico, y yo dije, puedo disponer de doscientos pesos, y apareció otro que no recuerdo, Rivera, y dijo, yo doy doscientos pesos y entre los dos pusimos los $400.

"P.—¿Dice Ud. que usan esa acera para guarecerse del agua, estaba cubierta? Si, señor; tenía cubierta, la misma solera, esto que se prolonga en la cobija, que cubría la acera.

"P.—¿Y se ponían allí para cubrirse del agua? Si, señor; y desde allí, cuando entraban oradores yo he saludado a Muñoz Rivera en la misma acera.

"P.—¿Dice que se guarecían del agua, estaba cubierta? El mismo volante de la casa cubre la acera.

A preguntas del abogado Sr. Jiménez Sicardó, declaró:

"P.—¿A pesar de haber constituído parte de esa fianza influye en su declaración algo, para que sea cierta o no cierta, para apartarse de la verdad? .Me concreto a decir la verdad y no tengo interés.

ETTIENE TOTTI

"P.—¿Con posterioridad a ese permiso tiene conocimiento el testigo de si Emilio Rodríguez fabricó la casa en cuestión? Emilio Rodríguez construía la casa a menos de cinco metros del eje de la calle, y tuvimos noticias en la oficina y fuimos a Manatí para comprobar esto y medimos y no se ajustaba a la distancia de cinco metros del eje de la calle.

Abogado Sr. Feliú.—Me opongo.   Nadie sabe por dónde va el eje.

"P.—¿Estuvo en el pueblo de Manatí?   Si, señor.

"P.—¿Midió la calle?   Si, señor.

"P.—¿Dentro de esa comprobación, qué quería hacer el testigo, qué hizo? Yo medía la distancia entre los sardineles para determinar el eje, porque éste es la distancia media entre los dos sardineles, y porque hay veces que una acera es más ancha que la otra, y se mide la distancia rodante de sardinel a sardinel.

"P.—¿Qué comprobó Ud.—Que la casa se construía a menos de cinco metros del centro del eje de la calle.

"Abogado Sr. Feliú.—Mientras no se establezca la línea de construcción por medio de documento y la prueba que la ley establece, todo lo que declare este testigo es inmaterial, y pido que se elimine.

"Hon. juez.—Admitida la pregunta y la contestación.

"Abogado Sr. Feliú.—Tomamos excepción.

"P.—Puede seguir.   ¿Cómo comprobó el eje?—Llegué a Manatí y encontré el eje de la calle en la forma que he dicho ya, y la casa se estaba construyendo a tres metros noventa y dos centímetros del eje, y miré en todos los alrededores y pude ver que la casa ésta se estaba construyendo dejando la antigua acera dentro de la casa, y seguí a la estación y pude ver que una verja antigua de madera quedaba metida un metro ochenta centímetros dentro de la nueva línea establecida por la casa de Emilio Rodríguez, y la línea de las propiedades, de los solares contiguos quedaba metida dentro de la línea vieja."

　　　*　　　*　　　*　　　*　　　*　　　*　　　*

A preguntas del abogado Sr. Feliú, declaró:

"P.—¿Lo que hizo fué, que llegó a la calle y cogió y midió desde el sardinel de la acera que queda a la derecha de la calle esta Avenida de Colón, yendo a la estación del ferrocarril, midió desde allí a la acera del frente?—Si, señor.

"P.—¿ Y en esta acera del frente, hasta qué acera midió.— Hasta un sardinel que forma la esquina de la calle.

"P.—¿ No es el mismo que existe actualmente allí?—Aquel fué destruído y hoy hay aceras nuevas.

"P.—¿ La calle está ancha hoy?—Si, señor; está en otra forma hoy.

"P.—Y cuando tomó esas medidas, qué aparato empleó?—No es necesario más que una cinta para medir una distancia.

"P.—¿ Nada más?—Una cinta métrica.

"P.—¿ Entonces todo lo que hizo para determinar eso fué medir aquella distancia entre esos dos sitios?—Si, señor; medir eso.

"P.—¿ Medir esa distancia entre las dos partes esas para determinar el eje?—Si, señor; después de medir del eje a la casa e inspeccionar como quedaba la casa con respecto a las condiciones del sitio.

"P.—¿ Nada más que eso hizo?—Si, señor.

*　　*　　*　　*　　*　　*　　*

A preguntas del Hon. Juez, declaró:

"P.—¿ Estuvo últimamente por allí?—Si, señor; y hoy cuando vine pasé por allí.

"P.—¿ Y mirando como están las cosas hoy, el eje sería distinto? Si, señor; el eje ha sido rodado hacia la casa de los Selgas."

A preguntas del abogado Sr. Jiménez Sicardó, declaró:

"P.—¿ Por qué ha habido que rodar ese eje?—Para dejar la avenida esa ancha. Al avanzar la casa de Emilio Rodríguez hacia el Este ha tenido que rodar toda la línea.

"P.—¿ Ha habido una variación en la alineación de la calle?— Si, señor."

GUSTAVO ADOLFO RAMÍREZ, a preguntas del abogado Sr. Jiménez Sicardó, declaró:

"P.—¿ Qué encontró Ud.?—Encontré que la casa había invadido la acera, la acera estaba dentro del edificio.

"P.—¿ Y qué pasaba?—Que la casa resultaba estar a menos de cinco metros del eje de la calle, violando el Reglamento de Sanidad.

"P.—¿ Por qué dice eso?—Porque determiné el eje de la calle.

"P.—¿ Cómo?—Midiendo de sardinel a sardinel, y midiendo la distancia del punto medio a la nueva construcción. La distancia de sardinel a sardinel es siete metros ochenta y cuatro centímetros,

luego la nueva construcción se lleva a cabo a tres metros noventa y dos centímetros del eje de la calle.''

La escritura del peticionario, citando al vendedor, expresa lo que sigue:

''(1) Que es dueña de la siguiente, —FINCA:—URBANA: casa de maderas, de una planta, con balcón al frente, techada de zinc, de diez metros cincuenta centímetros de frente, por quince metros de fondo, enclavada en solar propio, situado en la calle nombrada 'Avenida Colón' del pueblo de Manatí, de trece metros sesenta centímetros de frente por diez y siete metros de fondo, lindante casa y solar, por la derecha entrando o Sur, con la Sucesión de Don José Ramón González, hoy Selgas y Compañía; a la izquierda o Norte, con solar y casa de Joaquín Felicier; a la espalda o Este, tierras de Don Jaime Calaf; y al frente u Oeste, con la Avenida de Colón.

''PROCEDENCIA.—La hubo por derecho ganancial y por herencia de su finado esposo Don Salustiano Villamil, inscrita al folio 176, tomo 13 de Manatí, finca No. 713.''

La manifestación del testigo Santana nos deja hasta cierto punto en duda respecto a si la llamada acera se usaba principalmente para fines de tráfico o como incidental a la protección que suministraba el alero a lo largo del edificio. Hubiera sido más apropiado haber presentado con un poco más de detalles la cuestión sobre el fin que persiguiera el primo y anterior dueño del edificio al construir la ''acera''. También sería interesante saber algo más preciso sobre la escalera al final de la ''acera'', como por ejemplo, si los escalones se hicieron expresamente por el anterior dueño para conveniencia del público, o si fueron un mero accidente de construcción, o si se desgastaron por el tiempo y la intemperie o por el uso público, o si fué improvisación de algunos ciudadanos interesados en el beneficio público y como medio de acceso a esta ''acera'' de tan rara construcción.

Las aceras, por regla general, se ajustan y adaptan más o menos al nivel de la calle. Los hechos son cosas inelu-

dibles.   Ningún testigo corriente puede convertir una pared
de piedra en una acera simplemente refiriéndose a ella como
una acera.   Ni está ninguna corte obligada a adoptar tal
calificación cuando todas las circunstancias tienden a recha-
zar la conclusión envuelta.

El dueño de una casa situada en terrenos de otro puede,
si el dueño del terreno no se opone construir allí una acera
o cualquier otra edificación que sirva para el mismo fin y si
así lo desea, dedicarla al uso público.   Pero el uso poco
frecuente más o menos intermitente por parte del pú-
blico, durante un período de 16 o 18 años, de una pared
maestra u otra construcción levantada con algún fin que el
dueño conoce mejor que nadie, no puede sin más, producir
el efecto de una dedicación al público.

Si la prueba del peticionario hubiera demostrado que
la Avenida Colón era originalmente un canal para botes
sin quilla, con un sistema de exclusas y represas, la teo-
ría de una sola sección de acera con una escalera en uno de
sus extremos parecería algo más razonable.

La inexactitud de la aseveración respecto a que las de-
claraciones de los ingenieros sanitarios Totti y Ramírez fue-
ron admitidas sin objeción se verá inmediatamente de una
lectura de la cita arriba hecha de la declaración de Totti.
Las objeciones hechas no eran tan insistentes como quizás
sería necesario para establecer un fundamento de revoca-
ción por el único motivo de haberse cometido error al ad-
mitir las declaraciones en cuestión; pero dichas objeciones
eran más que suficientes para llamar la atención de la corte
hacia la carencia intrínseca de algún valor probatorio.   Aun
una ausencia absoluta de objeción a tales declaraciones no
podría prestar fuerza alguna adicional a las mismas ni jus-
tificar a la corte inferior en aceptar como verdaderas de-
claraciones que claramente se basaron en datos sin valor.
La conclusión de que Rodríguez construyó a menos de cinco
metros del eje de una calle que tenía menos de diez metros

de ancho, no tiene otro fundamento que la distancia deter-
minada entre una zanja y otra, o entre una zanja y un mon-
tón de tierra, en el terreno suave y pantanoso de nuestras
llanuras de la costa.

Estamos de acuerdo con la corte inferior en que la cuan-
tía de los daños no es un factor determinante; pero debe
haber algún daño, y *ese* daño debe ser irreparable por su
naturaleza. También debe existir alguna relación de causa
entre dicho daño y el demandado o alguien bajo su autori-
dad. Aceptando para los fines de esta opinión la conges-
tión de tráfico en la Avenida Colón como la ha descrito el
peticionario en su declaración, sin embargo, la alegación que
se hace no es que la calle sea más estrecha que antes sino
que el municipio puede andando el tiempo expropiar una
parte del frente del patio del peticionario. Es cierto que al
principio el peticionario temía por la seguridad de sus hi-
jos, pero su declaración misma, así como la de otros testigos
llamados por él a declarar, indica que actualmente existe
una calle mejor y más ancha con aceras de concreto en am-
bos lados en vez de la pared de piedra que anteriormente
existía en el solar opuesto al del peticionario. Admitiendo
a los fines de la argumentación que el no recibir una oferta
de compra, que tal vez pudo hacerse si el anterior *statu
quo* hubiera sido conservado intacto, es el medio adecuado
de acreditar la depreciación del valor, sin embargo, parece
apenas probable que la pérdida de tal oferta en perspectiva
se debiera bien a la situación de la pared este del edificio
del demandado o bien a las mejoras generales hechas en
los alrededores. Cualquier temida depreciación en el va-
lor de la propiedad del peticionario podría explicarse sola-
mente considerando la posibilidad más o menos remota de
que el municipio pudiera en alguna fecha en el futuro in-
tentar confiscar una parte del terreno limitado por la cerca
del peticionario. Resolver que el demandado en este caso
es responsable por cualquier dudoso resultado semejante,

derivado no de sus propios actos sino de los actos ejecutados o que amenazaba ejecutar el municipio, con los cuales él nada había tenido ni tiene que ver, sería extender el remedio extraordinario de *injunction* sobre un vasto campo nuevo y desconocido hasta ahora.

El artículo 2 del Reglamento, en el que tanto hincapié hizo la corte inferior, se refiere a terrenos que se destinan a ser urbanizados. El artículo 3 dispone que "toda calle trazada en estos terrenos tendrá una anchura mínima de 10 metros." El párrafo invocado del artículo 4 se refiere a "calles existentes cuya anchura sea inferior a diez metros." El artículo 7 es como sigue:

"Art. 7. Cada municipio deberá preparar dentro de un plazo de seis meses, un plano de los terrenos ya urbanizados comprendidos en su término municipal, y que no reunan las condiciones sanitarias fijadas en este reglamento; en dicho plano se harán constar las especificaciones necesarias para ajustar tales terrenos urbanizados a lo dispuesto en los artículos 3 y 4; y una vez que haya sido aprobado dicho plano por el Director de Sanidad, el municipio sólo podrá autorizar en adelante las construcciones que se hagan en dichos predios urbanos, de acuerdo con las condiciones especificadas en los expresados planos.

"Los propietarios de solares y edificios radicados en estos terrenos deberán ser notificados después de trazados los planos a que se refiere este artículo, para que puedan examinarlos, y presentar las observaciones que creyesen pertinentes, a fin de que los municipios las consideren y resuelvan.

"Las ordenanzas municipales que dicten en lo sucesivo los municipios para la urbanización, apertura y alineación de calles, deberán armonizarse con lo dispuesto aquí; y este reglamento no se entenderá en perjuicio de las facultades que tienen los municipios para regular, de acuerdo con la ley, otras materias que no afectan a la salud pública relativas à urbanización.

"La infracción de cualquiera de las disposiciones de este reglamento será penada con arreglo al artículo 33 de la Ley de Sanidad, en vigor desde el 1º. de abril de 1912."

Absolutamente nada existe en la prueba aducida por el

peticionario que indique que la Avenida de Colón fuera jamás "trazada"; o que el Municipio de Manatí sometiera plano alguno al Departamento de Sanidad para su aprobación, o que el Departamento hubiera en alguna fecha aprobado algún plano semejante; o que el Municipio de Manatí hubiese en alguna época concedido permisos para construir en desacuerdo con tales planos, o que el demandado, o algún otro dueño de propiedad colindante con la Avenida Colón, fuera jamás notificado de la existencia de algún plano semejante o de que alguna acción se hubiera tomado o pretendido tomar con respecto a ellos, o que el municipio jamás hubiera pasado ordenanza alguna relativa a la apertura o alineación de calle alguna en desacuerdo con las disposiciones de dicho reglamento.

No fue culpa de los demandados en este caso que el Municipio de Manatí nunca presentara los planos al Departamento de Sanidad, o que ese Departamento aprobara planos y especificaciones para construir que se le sometieron poco menos de diez años después de la promulgación del reglamento de 1912, en ausencia de tales planos y sin hacerse una mensura o inspección preliminar del sitio. El momento para el Departamento de Sanidad·Insular tomar medidas sobre el terreno, si algunas habían de tomarse, fue antes de la aprobación de los planos sometidos al mismo, y no después que la construcción de un costoso edificio de concreto estaba bastante adelantada sino casi terminada.

Tampoco encontramos la más leve prueba en apoyo de la conclusión a que llegó la corte inferior de que la nueva alineación o ensanche de la calle resultó en perjuicio de otros, dueños de propiedades en "línea directa hacia el Sud." Por otra parte es una circunstancia muy significativa que ninguno de estos dueños de propiedades colindantes se ha unido al peticionario en su protesta ni comparecido como testigo en el caso.

La moción de sobreseimiento debió haber sido declarada con lugar.

En vista de la conclusión a que hemos llegado sobre este punto, no · es necesario que discutamos la prueba del demandado. Bastará decir que si hubiera alguna duda en cuanto al error de la corte inferior al desestimar la moción de sobreseimiento, no puede haber alguna en cuanto a la proposición de que la sentencia no está sostenida por la prueba.

Podemos agregar, sin embargo, que el demandado, además de hacer una historia sobre el origen y objeto de la ·pared, acreditó mediante prueba oral que no fué contradicha que la mensura y planos para la pavimentación y arreglo de la Avenida Colón se hicieron en la época o antes de la época en que se hizo la concesión al demandado; que la casa que se halla en la esquina. contraria al edificio del demandado se encontraba allí desde hacía treinta años o más, siendo los dueños del edificio dueños de parte del terreno; que el espacio que mide entre este viejo edificio y la "orilla de la acera" arbitrariamente trazada por los ingenieros sanitarios como línea limitante de una calle era simplemente una desnuda faja o banco de tierra; que nunca se hizo mensura alguna anterior ni se estableció línea alguna de edificación o reglamentación en cuanto a ella; y (sujeto a aquellas contradicciones que puedan contener las .citas hechas de la prueba testifical del peticionario, *supra*) que las mejoras que de hecho se hicieron tendían a facilitar el tráfico, a presentar una vista más agradable, a aumentar el valor de la propiedad, y, en general, a mejorar las condiciones existentes en los alrededores. De acuerdo con la escritura del peticionario, el viejo edificio de la esquina, o el solar en que está enclavado, es una de las colindancias laterales, pero no hay prueba alguna que demuestre cuándo se construyó la casa del peticionario, o que explique por qué la cerca del frente de su patio está mucho más próxima al

"eje de la calle" que la línea de construcción de este antiguo edificio de la esquina.

El hecho más saliente en este caso es la carencia absoluta de una línea de construcción establecida, a menos que sea la indicada por el viejo edificio de la esquina al lado contrario de la propiedad del demandado, y que ha sido completamente pasado por alto tanto por los ingenieros sanitarios como por la corte inferior.

Es justo decir que el juez propietario del distrito no actuó en este caso y que el sustituto que presidió la corte había condenado al demandado en un proceso criminal en que estaban envueltos los sucesos que dieron lugar a esta controversia. (Véase el caso de *El Pueblo* v. *Rodríguez*, 29 D. P. R. 330.) El abogado del demandado en este caso no tomó parte en los procedimientos del caso criminal. Tal vez el fiscal presentó allí circunstancias que fueron pasadas por alto por los abogados del aquí peticionario. También es posible que la defensa no fuera tan ampliamente desarrollada mediante examen de repreguntas, o en otra forma, en el caso criminal. Alguna confusión de la prueba en los dos casos, existentes en la mente del juez sentenciador, puede que sea la verdadera explicación del resultado que tuvo el presente caso en la corte inferior. Pero sea ello como fuere, no podemos, desde luego, resolver la presente apelación por virtud de prueba aducida en otro caso que probablemente, según se presentó era muy distinto.

Debe revocarse la sentencia apelada.

> *Revocada la sentencia apelada y desestimada la demanda.*

Jueces concurrentes: Sres. Presidente del Toro y Asociados Wolf y Aldrey.

El Juez Asociado Sr. Franco Soto no intervino en la resolución de este caso.